## RANKEN *v.* McBRIDE.

(*City Court of Brooklyn, General Term.* June 24, 1889.)

EQUITY—CANCELLATION OF INSTRUMENTS—FRAUD.

In an action to annul a lease alleged to have been procured by the defendant fraudulently taking advantage of plaintiff's infirm condition, and of her trust and confidence in him, it appeared that plaintiff, a widow 66 years of age, had owned the property for several years; that two years before the execution of the lease she gave defendant a power of attorney to collect the rents; that he rendered monthly statements of receipts and disbursements, which statements she copied in a book kept by her, and gave defendant receipts, which she always read before signing. She testified that defendant often requested her to let him take the property, which she had refused; that at the time of the execution of the lease she had become broken down in health; that defendant came to her house with a lawyer, and that they had a long interview, during which the lease was executed, which left her in a comparatively helpless state; that she has no recollection of what took place; that the lawyer took the lease away with him; that she refused to sign receipts for payments under the lease until defendant assured her that her property was not bound; and that she did not know what a lease was. Her testimony as to her physical condition was confirmed by her nurse. Her son testified that he had offered $3,300 for the property, which was leased for $2,000. On behalf of defendant, it was shown that though physically weak, plaintiff's mental faculties were not impaired; that she suggested to the defendant to take charge of the property; that her son had formerly managed it, but that she had trouble with him, and said that he should not have it, if she never got anything out of it; that she told persons of the lease to defendant. The lawyer who drew the lease had been her attorney for years, and was in the habit of frequently calling to see her. He testified that he went to see her at her request, and received instructions for drawing the lease, and that at a subsequent meeting it was executed, and that she gave him her copy, stating as her reason that her papers had been interfered with. The lease was for a net annual rental of $2,000, and was made for a period of 10 years, with privilege of renewal for 5,—a period corresponding with the period of minority of her grandchild, for whom defendant was guardian, and to whom she had expressed an intention to devise it. The gross rental of the property was only $3,924.32, and the net receipts by defendant were only $559.70. *Held*, that no fraud or undue advantage was shown.

Appeal from special term.
Argued before OSBORNE and VAN WYCK, JJ.
*Benjamin F. Tracy*, for appellant. *Henry D. Birdsall*, for respondent.

OSBORNE, J. Plaintiff brings this action to annul a certain lease made by her to defendant, on the ground that while she was prostrated by sickness, and in an infirm condition, defendant, fraudulently taking advantage thereof, and of her confidence and trust in him, procured her signature to said lease, without disclosing to her its contents or effect. The lease is dated February 11, 1886, covers eight houses and lots, (six of them being tenement houses,) and is made for a period of ten years, with a right of renewal to defendant for five or ten years longer, at an annual rent of $2,000, payable monthly; the defendant, in addition, to pay all taxes, assessments, water-rates, insurance, and repairs. Defendant had judgment dismissing the complaint, from which judgment,

and the exceptions taken to the findings and conclusions, and the refusals of plaintiff's requests to find, this appeal is taken. On the argument of this appeal plaintiff's counsel contends that the circumstances surrounding the execution of the lease and the relations existing between the parties impose upon the defendant the burden of showing that he acted fairly and honestly, and took no advantage of the position which he occupied towards plaintiff. Conceding this to be the law applicable to a case of this character, it becomes our duty to examine the evidence, and determine if the conclusions of the learned trial judge are supported by the evidence.

Plaintiff was about 66 years of age at the time of signing the lease in question. She had owned the property since her husband's death, which occurred in 1882. She had employed defendant for some time prior to April, 1884, to do repairs for her on her property, and in that month she employed him as her agent to lease her property, and to collect her rents, at a salary of $10 a month, and executed a power of attorney to him for that purpose, dated April 25, 1884. This arrangement continued up to the time of making the lease in question. While such agent or attorney in fact, defendant was in the habit of rendering to plaintiff monthly statements of rents collected and disbursements. Plaintiff was in the habit of copying these statements into a book kept by her, and she gave defendant receipts, which she always read before signing. She testifies that defendant had, on several occasions prior to the making of the lease, sought to get her to let him take all her property, but that she always refused such proposals. She further testifies that for some time prior to the signing of the lease she had become broken down, weak, and debilitated by reason of her close and long continued attention to her sick daughter, Mrs. Donovan, who died January 6, 1886; that on the day the lease was made, and while she was in this weakened state, defendant was at her house with David Teese, a lawyer; that she had an interview with them lasting some time, and that at that interview the lease was executed; she claims to have no recollection of what took place at that interview; that, when it was over, she was in a comparatively helpless state, not being able to get downstairs without assistance, and in this last respect she is corroborated by her nurse and companion, Miss Stewart. She further testifies that her copy of the lease was taken away by Mr. Teese at the close of the interview; that when defendant made payments to her under the lease, and presented receipts to her to sign, which contained a reference to the lease in question, she always objected to signing them, and only did so when assured by defendant that there was nothing in them to bind her property. She states, in addition, that she never knew what a lease was till it was explained to her by her counsel just prior to bringing this action, which was commenced May 11, 1887. It further appears that, during all her connection with defendant, she reposed entire confidence in his integrity; that he negotiated certain real estate transactions for her, and superintended the erection of a house for her residence. This is substantially the story of the plaintiff. That at the time of the execution of the lease in question she was in poor health is also proven by her physician and nurse, and her son John also testifies that he at one time offered plaintiff a sum equivalent to $3,300 a year for the property, exclusive of the taxes on the Bedford avenue house, which she refused. Such a state of affairs, taken as wholly true would seem, in the absence of any contradictions and explanations, to afford a strong case for the interposition of the equitable powers of the court.

When, however, we examine the evidence on behalf of the defendant, and analyze the testimony of the plaintiff, a different light is shed upon the transaction, and our confidence in plaintiff's evidence is shattered. She testifies that she never knew what a lease was until it was explained to her by her counsel shortly before the commencement of this action, yet we find her executing a power of attorney to defendant to lease her property as early as April,

1884. Again, her testimony is that when a receipt for rent under the lease in question, and which referred thereto, was presented by defendant to her for signature, she said: "This describes a lease, and I never had no lease;" and further on: "If there was a lease of my property, I thought I ought to have it." In answer to an inquiry put by the court: "*Question.* Did Mr. McBride ever pay you any money since February, 1886?" she says: "O, yes; he has paid me every month a stipulated sum." Mr. Donovan, plaintiff's son-in-law, testifies: "Towards the last of February or first of March, along there, she told me she had leased the property to Mr. McBride. She told me that he was to give $2,000 a year, and he pay all the expenses in connection with the property; that is, taxes, repairs, and assessments." It further appears that about the time of making the lease, although plaintiff was then in poor health, she attended more or less to her household duties, and went out to ride. Her physician, called on her behalf, testified that he considered her able, and advised her so to do. He has nothing to say as to any impairment of her mental faculties. Her nurse, Miss Stewart, testified that she did not manifest any mental weakness, and her son-in-law, Donovan, says that he saw no difference in February in her health, her actions and appearance, from that of the preceding and following months. On cross-examination, when asked if she did not on two occasions request defendant to take a lease of her property at $2,000 a year, she refuses to deny that she did make such requests, but says that she does not remember doing so. That plaintiff was careful in her business transactions is evidenced by her own testimony; that she always copied the monthly statements rendered by defendant to her in a book, which she kept for that purpose; and that she signed no paper without first reading it over.

Defendant's testimony is to the effect that plaintiff first suggested to defendant his taking charge of her property; that previous to that her son John had acted as her agent in collecting her rents; that she became dissatisfied with his methods, had difficulty in getting money from him, had serious trouble with him, and that her solicitations eventuated in her getting defendant to act as her agent at a compensation of $10 a month; that plaintiff's son John had offered her $2,000 a year rent; that she stated that she would not give John her property, if she never got a dollar; that she said to defendant: "Will you take it, Mr. McBride? I don't want to be bothered with the repairing, and one thing and another." When the question of the term of the lease came up, plaintiff said she wanted defendant (who was trustee under Mrs. Donovan's will for the latter's child, then an infant of two years) "to have the property as long as you are executor for the baby." Then the term of ten years, with a privilege of renewal for five or ten years additional, was agreed on, and plaintiff said she would see Mr. Teese about it. Subsequently plaintiff sent for defendant to come to her house. He there met Mr. Teese, the lease was read over, and then executed in duplicate. Plaintiff handed her copy to Mr. Teese to keep for her, and defendant took his copy, and two or three days latter placed it on record. The evidence of Mr. Teese shows that he had acted as the counsel for plaintiff for some years previous to the making of the lease, in various matters, including the drawing of the power of attorney to defendant, her litigation with her son John before the surrogate of Kings county relating to her husband's estate, and she had also got him to draft a will for her. He also drew Mrs. Donovan's will. He was in the habit of frequently calling to see plaintiff. He testifies that plaintiff sent for him; that he called on her, and received instructions for drawing the lease in question; that he prepared it for execution, and then, at a subsequent meeting with the defendant, at plaintiff's house, the lease was read over, and executed by both parties; and plaintiff placed her copy of the lease in his custody, giving as a reason therefor that her trunk had been opened, and some of her papers had been interfered with. Defendant also produced Mr. Donovan, the

son-in-law of the plaintiff, as a witness. He testified, as before stated, to plaintiff's mental condition, and to her telling him that she had leased her property to defendant for a net annual rental of $2,000. He also testified that, on one occasion, his wife told him, in plaintiff's presence, that John, her son, had been there, and had offered to take the property for a net rental of $2,000, and that his wife advised her mother "not to take it; not to give it to John anyhow." He also testified as to the trouble with John, and "that John and his mother had not been good friends."

Now, let us examine into the question as to whether, by this lease, the defendant secured an undue and unfair advantage over the plaintiff by leasing the premises at an inadequate rental, as contended by her counsel. It appears from the evidence that the gross rent of the premises for one year prior to the making of the lease in question was $3,924.32. From this sum is to be deducted the taxes of 1886, amounting to $714.62; water-rates, $90; insurance, $60; repairs, about $500; making a total of $1,364.62. Deducting this amount from the gross rental of $3,924.32 leaves a net balance of $2,559.70. After paying plaintiff her rental of $2,000, there would be left to defendant a profit of but $559.70, out of which some allowance is to be made for premises lying idle for a time, and rents unpaid, which, as is well known, forms no inconsiderable item in letting tenement-house property. We cannot say that defendant's profit is so large as to justify us in holding that, by the terms of the lease, defendant secured an undue and unfair advantage over plaintiff. In so far as the witnesses contradict one another on material points, the rule is well settled that the findings of the trial judge on the disputed points will not be interfered with, unless it can be made to appear that the weight of evidence is against his findings. He sees the witnesses, hears them testify, observes their manner of testifying, and is more competent to judge of their respective credibility. We cannot say that the case here made calls for our interference in this respect. To sum it up briefly, we have here a case of a lady advanced in years, and in poor health, owning a class of property not usually deemed desirable for females to rely on for an income. She desires to get rid of all annoyance attendant on looking after it, and to secure to herself a fixed sum that she can depend upon receiving. She does not desire her property to be divided till her grandchild becomes of age, and accordingly she makes the lease in question for the period named; thereby securing to herself a fair return from her possessions, and freed from all uncertainty as to what that return will be. Taking all the facts and circumstances together, and after hearing the very able argument of the counsel for the appellant, and giving it careful consideration, we are of the opinion that the findings and conclusions of the learned trial judge should be sustained, and that the judgment should be affirmed. Judgment affirmed, with costs.

VAN WYCK, J., concurs.